IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PAUL VINSON,                        )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      1:17-cv-00798
                                    )
INTERNATIONAL BUSINESS              )
MACHINES CORPORATION,               )
                                    )
            Defendant.              )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

Plaintiff Paul Vinson, a former salesman for Defendant International Business Machines Corporation ("IBM"), alleges that IBM improperly capped his commissionable sales in 2015. (Doc. 9 ¶¶ 28-29.) Vinson seeks $177,720 in compensatory damages under seven causes of action denominated as follows: (1) breach of an oral and/or implied contract, (2) quantum meruit, (3) unjust enrichment, (4) violation of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1 et seq., (5) fraudulent misrepresentation, (6) negligent misrepresentation, and (7) punitive damages.  Before the court is IBM's motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 10.)  For the reasons set forth below, the motion will be granted in part and denied in part.

I.   **BACKGROUND**

The allegations of the amended complaint, which are accepted

as true and viewed in the light most favorable to Vinson for purposes of the present motion, show the following:

Vinson was a salesman for IBM's QRadar network security software and services from January 1, 2012, to July 31, 2015. (Doc. 9 ¶¶ 8-10.)  Given the option of receiving a larger salary with less opportunity to earn commissions or a smaller salary with the opportunity to earn larger commissions, Vinson chose the latter.  (Id. ¶ 12.)  He signed an Incentive Plan Letter ("IPL" or "Plan") on February 19, 2015.  (Id. ¶ 14; Doc. 9-1.)  The IPL contained Vinson's commission plan for the first half of 2015, from January 1, 2015, through June 30, 2015 (Doc. 9 ¶ 14), setting forth the details of his Plan (including his base pay percentage, target incentive percentage, and total quota of $2.1 million), and contained the following disclaimers:

> **Right to Modify or Cancel:** The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives (including management-assessment objectives), changes to assigned customers, territories, or account opportunities, or changes to applicable incentive payment rates or quotas, target incentives or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related payments have been earned under the Plan terms. Managers below the highest levels of management do not know whether IBM will or will not change or adopt any particular compensation plan; they do not have the ability to change the Plan terms for any employee; nor are they in a position to advise any employee on, or speculate about, future plans. Employees should make no assumptions about the impact potential

Plan changes may have on their personal situations unless and until any such changes are formally announced by IBM.

**Adjustments for Errors:** IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after the last day of the full-Plan period, and before or after the affected payment has been released.

                    *       *       *

**Significant Transactions:** IBM reserves the right to review and, in its sole discretion, adjust incentive achievement and/or related payments associated with a transaction which (1) is disproportionate when compared with the territory opportunity anticipated during account planning and used for the setting of any sales objectives; or for which (2) the incentive payments are disproportionate when compared with your performance contribution towards the transaction.

(Doc. 9-1). Both before and after Vinson accepted the IPL, IBM presented to him and others in the sales force a PowerPoint describing the terms of its commission plans for employees. (Doc. 9 ¶ 15.) The PowerPoint was titled "Our Purpose, Values & Practices" relating to "Your 2015 Incentive Plan" and stated that "[e]arnings opportunity remains uncapped." (Id. ¶ 16; Doc. 9-2). Vinson alleges that, both before and after he accepted the IPL, his supervisor, Joseph Mitchell, told him that his commission opportunities would not be capped. (Doc. 9 ¶ 17.)

Vinson made $19,012,545 in sales for the first half of 2015, with "just over $11 million" of that amount coming from a deal

with Delta Air Lines. (Id. ¶¶ 20–21.) In mid-June of 2015, Vinson had a conversation with Tom Preston, Vinson's second-line supervisor, informing him that he was likely going to leave IBM for work-life balance and reduced stress reasons. (Id. ¶¶ 22–23.) During this conversation, Vinson told Preston that he wanted to stay on with IBM for "some period" to monitor the sales closure for the Delta Air Lines deal and a deal with the State of South Carolina, and to monitor the sales/commission tracking dashboard to make sure he received his full commission on both deals. (Id. ¶ 23.) Vinson further told Preston that he could help train his replacement if he stayed on, but that he would only remain at IBM if he would be allowed to work for both IBM and his new employer during the month of July. (Id.) Preston agreed to the proposal, stating that Vinson would receive his full commission on those two deals if they closed, that Vinson could work for both employers during July, and that Vinson could help train his replacement. (Id.) Vinson agreed to continue to work at IBM through July, despite the fact that he knew he would not receive any commission for sales occurring during the month of July. (Id. ¶ 24.) Vinson finished the Delta Air Lines and South Carolina deals, trained his replacement, and worked for both employers during the month of July. (Id. ¶ 23.)

Around July 28, 2015, Vinson learned that IBM was putting his commissions through a process "where exceptional sales

achievements were reviewed for accuracy and to make sure that the salesperson actually substantially contributed to the deals." (Id. ¶ 25.) Around September 25, 2015, Vinson learned that IBM "was going to cap his commissionable sales," though he was not told by how much. (Id. ¶ 27.) IBM eventually capped Vinson's commissionable sales at 400% of his quota, which was less than half of what Vinson would have been paid without any cap. (Id. ¶ 28.) Vinson alleges that IBM only paid him $134,011 in commissions, but that under the Plan he should have earned $311,731, leaving him underpaid by $177,720. (Id. ¶ 29.) He calculates that the amount he should have been paid was only 1.64% of his total sales, which is less than the industry standard of 2% of commissionable sales until quota is met and 5% of commissionable sales after that; following the industry standard would have resulted in higher pay by IBM. (Id. ¶¶ 30–31.) Vinson charges that "IBM has a history of capping the commissions on large sales, despite constantly telling its salespeople that their commissions will not be capped." (Id. ¶ 33.) He further alleges that IBM has commission budgets where the company internally decides that it will not pay more than a certain amount in commissions for a given deal, and that "when the commission plan requires more commissions than the budget allows for, IBM caps the commissions." (Id.)[1]

---

[1] The amended complaint relies on portions of depositions of IBM employees in a similar action, Choplin v. Int'l Bus. Machs. Corp.,

IBM's motion to dismiss the amended complaint has been fully briefed, and the court heard argument on September 5, 2018. The motion is therefore ready for resolution.

## II.  ANALYSIS

### A.    Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  In considering a Rule 12(b)(6) motion, a court first "separates factual allegations from allegations not entitled to the assumption of truth."  <u>Sauers v. Winston-Salem/Forsyth Cty. Bd. of Educ.</u>, 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016).  Conclusory allegations and allegations that are simply a "formulaic recitation of the elements" are not entitled to the assumption of truth.  <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 681).  The court then determines "whether the factual allegations, which are accepted as

---

No. 1:16-cv-01412 (M.D.N.C. filed Dec. 16, 2016), which was pending at the time the present action was filed.  (Doc. 9 ¶¶ 36-39.)  Vinson alleges that these depositions make clear that IBM had an obligation not to cap commissions, that salespeople were entitled to rely on the statements in IBM PowerPoint presentations that their commissions would not be capped, and that IBM's reduction of commissions for Choplin and Vinson constituted "capping."  (<u>Id.</u> ¶ 38.)  Because the portions of these deposition excerpts Vinson cites are not fully contextualized and further do not alter the outcome of the court's decision, they will not be addressed at this time.

true, 'plausibly suggest an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 681). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable," demonstrating "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556)).

The purpose of a motion under Rule 12(b)(6) is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).

**B. Breach of Oral and/or Implied Contract**

Vinson alleges in his first claim for relief that "[b]y the words and actions of IBM and its agents both before and after February 19, 2015, IBM and Mr. Vinson entered into an express oral contract, and/or an implied contract, that IBM would pay Mr. Vinson the full amount of his commission without capping the amount of commissionable sales." (Doc. 9 ¶ 42.) Vinson alleges that the

oral and/or implied contract is comprised of the contents of the PowerPoint, "the statements of Mr. Mitchell that Mr. Vinson's commission would not be capped," "the statements of Mr. Preston that Mr. Vinson's commission would not be capped, as part of the agreement that Mr. Vinson would stay on for another month," and "the fact that IBM had never before capped a commission to Mr. Vinson's knowledge, as reported to him by several IBM employees and managers." (<u>Id.</u>)

The parties agree that North Carolina law applies to all of Vinson's claims in this diversity action.[2]  <u>See</u> <u>Erie R.R. v. Tompkins</u>, 304 U.S. 65 (1938).  To state a claim for breach of contract under North Carolina law, a plaintiff must allege the existence of a valid contract and breach.  <u>McCabe v. Abbott Labs., Inc.</u>, 47 F. Supp. 3d 339, 345 (E.D.N.C. 2014) (citing <u>Poor v. Hill</u>, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000); <u>Jackson v. Carolina Hardwood Co.</u>, 463 S.E.2d 571, 572 (N.C. Ct. App. 1995)).  A valid contract consists of an offer, acceptance, consideration, and mutuality of assent to the contract's essential terms.   <u>Se. Caissons, LLC v. Choate Const. Co.</u>, 784 S.E.2d 650, 654 (N.C. Ct. App. 2016) (citing <u>Snyder v. Freeman</u>, 266 S.E.2d 593, 602 (N.C.

---

[2]  While the parties do not analyze why North Carolina law applies, it is apparent that Plaintiff is a North Carolina citizen whose sales territory included North Carolina.  (Doc. 9 ¶ 1; Doc. 9-1 at 2.)  In any event, there is no indication that even if North Carolina law did not apply, the applicable law would be materially different for purposes of this motion.

1980) ("The essence of any contract is the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds.")).

Mutual assent requires the parties to "assent to the same thing, in the same sense." Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F. Supp. 2d 386, 400 (M.D.N.C. 2003) (quoting Horton v. Humble Oil & Ref. Co., 122 S.E.2d 716, 719 (N.C. 1961) (internal quotation marks omitted)). Where the parties' intent is not clear from a writing, it may be inferred from the parties' actions. Se. Caissons, 784 S.E.2d at 655 (quoting Branch Banking & Tr. Co. v. Kenyon Inv. Corp., 332 S.E.2d 186, 192 (1985)); see also Arndt v. First Union Nat'l Bank, 613 S.E.2d 274, 278 (N.C. Ct. App. 2005) (noting that the parties' intentions control construction of a contract, and their writings and actions can indicate their intentions).

"When an employer retains total discretion concerning whether to pay a bonus, there is no mutual agreement and no contract." McCabe, 47 F. Supp. 3d at 345 (citing Schoenberg v. E.I. DuPont DeNemours & Co., No. 1:97CV109, 1997 U.S. DIST. LEXIS 18331, at *11–12 (W.D.N.C. Oct. 9, 1997) (applying North Carolina law), aff'd, 155 F.3d 561, 1998 WL 390613, at *2–3 (4th Cir.1998) (per curiam) (unpublished table decision); Moore v. Associated Brokers, Inc., 176 S.E.2d 355, 355–56 (N.C. Ct. App. 1970) (applying North

Carolina law); accord Jensen v. Int'l Bus. Machs. Corp., 454 F.3d

382, 388 (4th Cir. 2006) (applying Virginia law)).

The parties agree that the IPL does not constitute an

enforceable contract. (Doc. 11 at 9; Doc. 12 at 13, 17; Doc. 14

at 6.) However, IBM argues that the IPL governs payment of

Vinson's commissions and that the disclaimers contained within it

precluded the formation of any enforceable contract. (Doc. 14 at

6.)[3] Similarly, IBM maintains that the IPL therefore precluded

---

[3] In support of this position, IBM relies on a host of cases from several
jurisdictions interpreting various versions of its IPL. (Doc. 11 at 11–
12.) These cases are largely distinguishable because they addressed
whether the IPL itself was a binding contract, involved versions of the
IPL with language reserving greater discretion to IBM to modify or cancel
its plan terms, or the surrounding circumstances were factually
distinguishable. See Jensen, 454 F.3d at 388–89 (finding that the IPL
did not constitute an enforceable contract because IBM reserved the right
to modify or cancel the Plan terms "up until actual payment has been
made"); Wilson v. Int'l Bus. Machs. Corp., 610 F. App'x 886, 888–89 (11th
Cir. 2015) (finding that IBM did not breach the IPL when it modified an
employee's quota for a significant transaction based on IBM's authority
under the significant transactions clause); Kavitz v. Int'l Bus. Machs.
Corp., 458 F. App'x 18, 20 (2d Cir. 2012) (finding that both the
plaintiff's claim that the Plan constituted an enforceable contract and
the plaintiff's implied contract claim, based on the Plan and IBM's prior
actions, failed as a matter of law because the Plan's express language
indicated that IBM did not intend to create a binding contract governing
incentive compensation); Geras v. Int'l Bus. Machs. Corp., 638 F.3d 1311,
1316–17, 1317 n.1 (10th Cir. 2011) (finding that IBM's IPL made clear
IBM's intent not to form a contract); Pfeister v. Int'l Bus. Machs.
Corp., No. 17-CV-03573-DMR, 2017 WL 4642436, at *3–4 (N.D. Cal. Oct. 16,
2017) (holding that the language in the IPL's "Right to Modify or Cancel"
provision indicated that the parties lacked mutual assent to enter a
contract and that the IPL lacked sufficiently definite terms to form a
contract); Kemp v. Int'l Bus. Machs. Corp., No. C-09-4683 MHP, 2010 WL
4698490, at *5–6 (N.D. Cal. Nov. 8, 2010) (granting IBM's motion to
dismiss on the grounds that the IPL's language did not create a contract
and that at the time IBM modified the payment amount the employee had
not earned the disputed commissions under the Plan terms); Schwarzkopf
v. Int'l Bus. Machs. Corp., No. C08-2715 JF, 2010 WL 1929625, at *9–10
(N.D. Cal. May 12, 2010) (finding that IBM's reduction of an employee's
commission payment for a significant transaction was within IBM's

Vinson from relying on any statements regarding commissions outside the IPL - such as in the PowerPoint presentation — to create a "side contract" that supersedes the IPL. (Id. at 4-6.)

Vinson's IPL, attached to the amended complaint as Exhibit A, requires that IBM employees accept it to become eligible to receive any incentive payments. (Doc. 9-1 at 2.) Vinson concedes he accepted his IPL, which contained an acknowledgement that he "read and understood the contents of [the] letter and the official Plan terms." (Id.; Doc. 9 ¶ 14.) The IPL further contained the disclaimer that

> [m]anagers below the highest levels of management do not know whether IBM will or will not change or adopt any particular compensation plan; they do not have the ability to change the Plan terms for any employee; nor are they in a position to advise any employee on, or speculate about, future plans. Employees should make no assumptions about the impact potential Plan changes may have on their personal situations unless and until any such changes are formally announced by IBM.

(Doc. 9-1 at 3.)

Vinson alleges that he entered into an oral and/or implied contract based on Mr. Mitchell's and Mr. Preston's representations

---

discretion per the IPL's significant transactions clause); Rudolph v. Int'l Bus. Machs. Corp., No. 09C428, 2009 WL 2632195, at *3-4 (N.D. Ill. Aug. 21, 2009) (finding that the employee's breach of contract claim failed as a matter of law because the language in the IPL allowed IBM to modify or cancel the plan "at any time for any reason"); Gilmour v. Int'l Bus. Machs. Corp., No. CV 09-04155 SJO, 2009 WL 8712153, at *1-2 (C.D. Cal. Dec. 16, 2009) (holding that there was no enforceable employment contract because the terms of the offer letter stated that IBM reserved the right to modify or cancel the incentive plan at any time).

that his commissions would not be capped.  (Doc. 9 ¶ 42.)  Vinson does not allege that either Mr. Mitchell or Mr. Preston was a manager at "the highest level of management," and at the hearing on IBM's motion Vinson's counsel admitted that Vinson was not contending that either supervisor was part of the "highest levels of management."  Accordingly, the plain language of the IPL informed Vinson that neither supervisor, as a manager below the highest levels of management, could change or advise him on his commission payment plan.  Therefore, Vinson's claim that the statements of Messrs. Mitchell and Preston constituted an oral and/or implied contract with IBM not to cap commissions fails as a matter of law.

Vinson also alleges that an oral and/or implied contract was created by the PowerPoint and IBM's alleged practice of having never before capped a commission.  (Doc. 9 ¶ 42.)  The plain language of the IPL disclaims any intent on behalf of IBM to be bound to pay a particular amount for commissions.  (Doc. 9-1 at 3 ("The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it.")  Rather, the IPL reserves to IBM the right to cancel or modify any payment at any time before it is "earned," as well as reserving the right to adjust payment amounts for errors and significant transactions. (Doc. 9-1 at 3, 4.)  The Second Circuit considered an implied-in-fact contract claim brought by an IBM employee governed by an IPL

with substantially similar language in the "Right to Modify or Cancel" provision and concluded that the claim failed as a matter of law because the IPL disclaimers made clear that "IBM never intended to create a binding contract governing incentive compensation." Kavitz, 458 F. App'x at 19–20 (noting that the Plan stated it "does not constitute an express or implied contract or a promise by IBM to make any distributions under it," and "IBM reserves the right to adjust the Plan terms, including but not limited to, any quota and target incentives, or to cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related incentive payments have been earned under its terms"). Regardless of the statements in the PowerPoint and the alleged practice of not capping commissions, therefore, the plain language of the IPL clearly disclaimed any intent on behalf of IBM to be committed to any commission payment requirement, including not capping.[4]

---

[4] At the hearing, Vinson's counsel relied on Irwin v. Fed. Express Corp., No. 1:14cv557, 2016 WL 7053383 (M.D.N.C. Dec. 5, 2016), to argue that whether an oral contract is formed is a question of fact that should be decided by a jury. Vinson's counsel also argued that Vinson's situation is similar to that in Irwin, where the court held that a factfinder could conclude that the employer's offer of severance benefits constituted a supplementary contract to the employee's at-will employment. Id. at *5-6. This is a new argument that the court need not consider, as it was not included in Vinson's brief in opposition to the motion to dismiss. N.C. All. for Transp. Reform, Inc. v. United States DOT, 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010) ("Raising such new arguments for the first time at oral argument undermines the purpose of orderly briefing and risks subjecting an opponent to an unfair disadvantage."). Nevertheless, the arguments do not save Vinson's claim. First, whether a contract was formed presents a jury question only where the parties' intent is not clear from a writing. Se. Caissons, 784 S.E.2d at 655. Here, IBM's IPL

Vinson's counsel argued at the hearing that the IPL cannot be incorporated into the alleged oral and/or implied contract because the PowerPoint, which was presented both before and after the IPL was executed, did not contain any provision incorporating the IPL.[5] This does not save the claim. The IPL clearly states that no payment of commissions will be made without an employee's acceptance of its terms, incorporates the PowerPoint and all materials about IBM's incentives program by reference via an internet link (Doc. 9-1 at 2), and was executed early in the employment period. See <u>Jensen</u>, 454 F.3d at 389 (finding that the disclaimer in an incentive plan brochure directing employees to

_____

expressed a clear intent not to enter into a contract concerning commission payments. Second, Vinson's claim is factually distinguishable. <u>Irwin</u> involved whether FedEx's alleged agreement to pay severance benefits in exchange for the employee's continued performance constituted either a bilateral contract or unilateral offer to contract. 2016 WL 7053383, at *3–6. Here, in contrast, the disclaimers in the IPL leave no question that IBM did not assent to enter into a bilateral contract concerning commission payments. As to the unilateral contract claim, <u>Irwin</u> involved a payment the employee would not have otherwise received pursuant to his at-will employment. <u>Id.</u> at *5. In contrast, the commissions Vinson alleges arise by virtue of his IPL, since he could not receive incentive payments without accepting its terms. (Doc. 9-1 at 2.) The PowerPoint that Vinson alleges created a contract was a document that explained the terms of the company's various IPL options for sales employees. (Doc. 9 ¶ 15; Doc. 9-2 generally and at 17 (setting out schedule for issuance of IPL letters and acceptance of IPL)). This situation therefore differs from the employee's situation in <u>Irwin</u>, where no document clearly disclaimed the employer's intent to form a contract concerning the payments at issue.

[5] At the hearing, Vinson's counsel emphasized that the brochure in <u>Jensen</u> included a disclaimer directing employees to consult their IPL for further details. 454 F.3d at 389 (the brochure stated that "the employee should consult the IBM intranet as well as local arrangements authorized under the plan, such as the 'Playbook' and his quota letter, for further details").

consult the IBM intranet and other plan documents for further details "amount[ed] to an incorporation by reference to intranet materials that . . . are all terms of the 'offer' on which [the plaintiff] relies"); see also Booker v. Everhart, 240 S.E.2d 360, 363 (N.C. 1978) ("To incorporate a separate document by reference is to declare that the former document shall be taken as part of the document in which the declaration is made, as much as if it were set out at length therein.").

Because Vinson has failed to allege facts sufficient to permit a plausible inference that a contract existed, the first cause of action for breach of contract fails as a matter of law.

**C.   Quantum Meruit/Unjust Enrichment**[6]

In his second and third causes of action, Vinson alleges that he conferred a benefit on IBM by selling its software and services, that he did not receive the value of the work he performed because he did not receive the commissions to which he was entitled as a

---

[6]  Though Vinson pleads these as separate causes of action, he conceded at the September 5 hearing that they are the same claim for purposes of this case.  Compare TSC Research, LLC v. Bayer Chems. Corp., 552 F. Supp. 2d 534, 540 (M.D.N.C. 2007) ("To establish a claim for quantum meruit, also known as unjust enrichment, a plaintiff must show three elements") with Elite Outsourcing Grp., Inc. v. Healthsouth Corp., 2006 WL 1666739 at *1-2 ("Under North Carolina law the elements of quantum meruit are: '(1) the services were rendered to defendants; (2) the services were knowingly and voluntarily accepted, and (3) the services were not given gratuitously.' . . .  Claims for unjust enrichment are similar.  '[A] plaintiff must allege that property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received.'" (citations omitted)).

result of the benefit conferred, and that IBM was therefore unjustly enriched by his work. (Doc. 9 ¶ 53-58.)

To plead a claim for unjust enrichment, a plaintiff must allege that he conferred a measurable benefit on another, the other party consciously accepted the benefit, and the benefit was not conferred gratuitously. Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp., 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005) (citing Se. Shelter Corp. v. BTU, Inc., 572 S.E.2d 200, 206 (2002)).[7] An unjust enrichment claim is "a claim in quasi contract or a contract implied in law," and "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." McCabe, 47 F. Supp. 3d at 348 (first quoting Rev. O. Inc., v. Woo, 725 S.E.2d 45, 49 (N.C. Ct. App. 2012); then quoting Booe v. Shadrick, 369 S.E.2d 554, 556 (N.C. 1988) (internal quotation marks omitted)).

Where an employer retains total discretion concerning whether to make bonus payments, courts have found that it is not unjustly enriched when it decides to exercise discretion to pay employees

---

[7] IBM argues that "the Fourth Circuit has held that recovery under a theory of unjust enrichment 'requires a showing of one of three elements: (1) the payee had a reasonable expectation of payment; (2) the payer should reasonably have expected to pay; or (3) society's reasonable expectations of person and property would be defeated by nonpayment.'" (Doc. 11 at 16) (citing Neal v. GMC, 266 F. Supp. 2d 449, 456 (W.D.N.C. 2003)). However, the case IBM cites involved a claim under the Employee Retirement Income Security Act and applies the federal common law theory of unjust enrichment. In this case, as the parties have agreed, North Carolina's state common law applies.

16

only their salary.  McCabe, 47 F. Supp. 3d at 349 ("McCabe
worked . . . in exchange for a base salary and the possibility, at
Abbott's discretion, of bonus compensation.  Simply put, '[Abbott]
was not unjustly enriched by [McCabe] performing the job she was
paid to perform." (citations omitted)).  Where an employer pays an
employee a base salary with the possibility of commissions, but
does not retain absolute discretion as to whether to pay the
commission, an employee who has not been paid the full amount of
commissions can state a claim for unjust enrichment.  See, e.g.,
Kornegay v. Aspen Asset Grp., LLC, No. 04-CVS-22242, 2006 WL
2787897, at *10 (N.C. Super. Ct., Sept. 26, 2006) (denying
Defendants' motion for summary judgment on quantum meruit claim,
event though plaintiff "received a substantial salary for his
services," where plaintiff had evidence of generating profits
during his employment and "his incentive for doing so was the
expectation of receiving additional compensation for his
efforts").

IBM argues that it could not have been unjustly enriched
because Vinson was paid a base salary separate from his incentive
payments.  (Doc. 11 at 15-16.)  Vinson responds that his salary
does not represent full compensation, because he has alleged that
he had a choice between receiving a larger salary with less
opportunity to earn commissions or a smaller salary with the
opportunity to earn larger commissions.  (Doc. 12 at 18.)  Because

he chose the smaller salary option, Vinson contends, the salary alone does not represent full compensation for his work. (Id.) He also argues that his situation differs from those where unjust enrichment claims for commissioned employees were rejected because those cases involved employers who retained absolute discretion to make commission payments while IBM did not. (Id. at 17–18.)

When the facts are viewed in the light most favorable to Vinson, as they must be at this stage, the court cannot say that he has failed to state a plausible claim. Although the IPL vests IBM with discretion to modify or cancel commission payments, its discretion is limited to any time before the commissions are "earned." (Doc. 9–1 at 2); see Jensen, 454 F.3d at 389 (noting that without the "until actual payment has been made" vesting language in the IBM employee's "Right to Modify or Cancel" provision, "a commission might be earned when the sale is made"); see also Schwarzkopf, 2010 WL 1929625, at *9 (noting that the identical "until any related payments have been earned under [the Plan's] terms" language in the IBM employee's "Right to Modify or Cancel" provision "may prevent IBM from modifying the terms of the incentive plan once a salesperson 'earns' commission [sic] by completing a sale"). Thus, IBM's discretion is not absolute. In this respect, Vinson's case differs from those relied on by IBM to urge dismissal because Vinson was paid a base salary. See McCabe, 47 F. Supp. 3d at 348–349 (finding that the employer was not

unjustly enriched by the sales representative performing the job she was paid a salary to perform where the criteria documents governing incentive payments for sales representatives and employer's oral presentations at meetings summarizing the criteria documents stated that all bonus awards were in the employer's "sole, absolute, and final discretion"); see also Dulaney v. Inmar, Inc., 725 S.E.2d 473 (N.C. Ct. App. 2012) (unpublished table opinion) (finding employer not unjustly enriched when it paid plaintiff a base salary but not commissions because the employer had made clear that an employee was only eligible for a bonus if he was employed at the time of payout, which plaintiff was not.)

Vinson alleges that IBM capped his commissions payment at 400% of his quota on September 25, 2015 (Doc. 9 ¶ 28), and the amended complaint does not indicate that IBM was operating pursuant to the significant transactions provision (indeed, Vinson's counsel argued at the hearing that IBM was not). The commission period for the first half of 2015 closed on June 30, 2015. (Doc. 9 ¶ 14.) Given this timeline, Vinson has alleged sufficient facts to permit the plausible inference that IBM's change to his commission payment was a cap imposed after the commissions had been "earned" and thus outside IBM's discretion to reduce the commissions on that basis.[8] Since Vinson chose the smaller salary

---

[8] Whether IBM relied on the significant transaction provision to reduce Vinson's commissions, as it contends (Doc. 14 at 8), is not apparent

with the opportunity to earn more commissions, and he alleges that
IBM capped his commissions in a manner beyond IBM's discretion, he
has plausibly alleged a claim for unjust enrichment.  Vinson has
further sufficiently alleged that he conferred a benefit on IBM in
the form of his making significant sales of its software and
services, that IBM accepted this benefit, the benefit was not
conferred gratuitously because Vinson made the sales expecting to
be paid a salary and his full commissions, and that IBM was
unjustly enriched by capping his commissions after Vinson had
earned them after having accepted a compensation option of a lower
base salary.  Because Vinson has alleged facts sufficient to permit
the plausible inference that IBM's actions constituted unjust
enrichment, the motion to dismiss the second and third causes of
action will be denied.

> ### D.   North Carolina Wage and Hour Act

The fourth cause of action alleges that IBM violated § 95-
25.6 of the NCWHA by failing to pay Vinson his wages as they became
due.  (Doc. 9 ¶ 61.)  Vinson contends he is an "employee," IBM is
an "employer," and the commission payments he should have received
constitute "wage[s]" under N.C. Gen. Stat. § 95-21.2.  (Doc. 9
¶ 60.)   He seeks unpaid commissions, interest, additional

---

from the face of the amended complaint and must await a consideration
of the facts.

liquidated damages in the amount of the unpaid commission, plus

attorneys' fees, per N.C. Gen. Stat. § 95-25.22.  (Doc. 9 ¶ 14.)

Section 95-25.6 of the NCWHA provides:

> Every employer shall pay every employee all wages and
> tips accruing to the employee on the regular payday.
> Pay periods may be daily, weekly, bi-weekly, semi-
> monthly, or monthly.    Wages based upon bonuses,
> commissions, or other forms of calculation may be paid
> as infrequently as annually if prescribed in advance.

N.C. Gen. Stat. § 95-25.6.   The NCWHA defines "wage" as

"compensation for labor or services rendered by an employee whether

determined on a time, task, piece, job, day, commission, or other

basis of calculation" and provides that "[f]or the purposes of

G.S. 95-25.6 through G.S. 95-25.13 'wage' includes sick pay,

vacation pay, severance pay, commissions, bonuses, and other

amounts promised when the employer has a policy or a practice of

making such payments."   N.C. Gen. Stat. § 95-25.2(16).   For

purposes of the NCWHA, "earned wages" are "those wages and benefits

due when the employee has actually performed the work required to

earn them."   Irwin, 2016 WL 7053383, at *8 (quoting Whitley v.

Horton, 608 S.E.2d 416, *5 (N.C. Ct. App. 2005) (unpublished table

opinion)) (citing Narron's v. Hardee's Food Sys., Inc., 331 S.E.2d

205, 207-08 (N.C. Ct. App. 1985), overruled on other grounds by J

& B Slurry Seal Co. v. Mid-S. Aviation Inc., 362 S.E.2d 812 (N.C.

Ct. App. 1987)).

IBM argues that Vinson's NCWHA claim fails as a matter of law

because there is no enforceable agreement regarding the payment of commissions. (Doc. 11 at 12-13.)[9] Vinson contends that he has alleged that there is an enforceable agreement not to cap commissions. (Doc. 12 at 15-16.)

IBM misstates the requirements for an NCWHA claim. To state a claim under the act, there need not be an enforceable agreement, provided the employer has a "policy or a practice of making such payments." N.C. Gen. Stat. § 95-25.2(16). While an employment relationship is required to bring a claim under § 95-25.6, "the statute contains no requirement of an express contract or agreement to pay for particular work." Martinez-Hernandez v. Butterball, LLC, 578 F. Supp. 2d 816, 821 (E.D.N.C. 2008). Accordingly, a NCWHA claim does not fail as a matter of law simply because the plaintiff has failed to allege the existence of an enforceable contract. Buckner v. United Parcel Serv., Inc., No. 5:09-CV-411-BR, 2010 WL 2889586, at *3 (E.D.N.C. July 21, 2010) ("[A] violation of [N.C. Gen. Stat. § 95-25.6] need not be based upon an express

---

[9] IBM also argues that even if the court does not dismiss Vinson's NCWHA claim in its entirety, it should dismiss his claim for liquidated damages because it acted in good faith and had reasonable grounds for believing that it could adjust commissions. (Doc. 11 at 14.) Liquidated damages are a remedy available for a violation of the NCWHA. N.C. Gen. Stat. § 95-25.22. If an employer "shows to the satisfaction of the court that the act or omission constituting the violation was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this Article," the court has the discretion to decide whether to award liquidated damages. Id.; see also Arndt, 613 S.E.2d at 283. Because liquidated damages is a remedy that may be imposed for a violation of the NCWHA and depends on the facts, it is premature to consider it at this pleading stage.

contract"), aff'd, 489 F. App'x 709 (4th Cir. 2012); See also McCabe, 47 F. Supp. 3d at 346–47 (finding that no contract had been formed, but then considering whether the employee had an NCWHA claim); Cole v. Champion Enters., Inc. 496 F. Supp. 2d 613, 626 (M.D.N.C. 2007) (finding no enforceable contract between the employee and employer, but then considering and rejecting the NCWHA claim because there was no dispute whether the company ever promised the employee the bonus at issue and the employee had not performed the work required to earn it by the time of his termination).

Accordingly, Vinson's NCWHA claim does not fail simply because of the absence of an enforceable agreement. Vinson has plausibly alleged an employment relationship with IBM, a written commission policy for the first half of 2015 as set out in the IPL, and IBM's payment of a salary and commissions for his work. (Doc. 9 ¶¶ 8–12, 14, 29; Doc. 9–1.) Vinson's allegations permit the inference that his unpaid commission constitute "wages" under the NCWHA, because they are compensation for his service as a salesman made pursuant to IBM's policy or practice of not capping commissions. Vinson further alleges that his unpaid commissions constitute "earned wages," as defined in the NCWHA, because he had actually performed the work required to earn the commission by making his commissionable sales for the first half of 2015. (Doc. 9 ¶¶ 20, 29; Docs. 9–3, 9–4, 9–5, 9–6.)

IBM argues that its "obligation not to cap Plaintiff's overall earnings opportunity is not inconsistent with its right to adjust Plaintiff's commissions on significant transactions." (Doc. 14 at 6-7.)  This may be true.  But Vinson does not allege that the unpaid commissions are the result of an adjustment for a significant transaction.  Rather, he alleges that they resulted from IBM's decision to cap his commissionable sales for the first half of 2015 at 400% of his quota.  (Doc. 9 ¶ 28.)  Accordingly, IBM's argument that it could adjust Vinson's commission depends on facts not alleged, is not ripe for consideration at this pleading stage, and is not relevant to whether the amended complaint alleges that IBM had a policy or practice of paying uncapped commissions. IBM's motion to dismiss this claim is therefore denied.

**E.  Fraudulent Misrepresentation**

The fifth claim for relief alleges that IBM's statements, made through its agents, that Vinson's commission would not be capped constitute fraudulent misrepresentations.  (Doc. 9 ¶¶ 63-67.)  Vinson alleges that the PowerPoint and the statements of Messrs. Mitchell and Preston were false representations intended to deceive him that could be reasonably and justifiably relied on. (Doc. 9 ¶¶ 64-66.)

To state a claim for fraudulent misrepresentation, a complaint must plausibly allege: "(1) [a] false representation or concealment of a material fact, (2) reasonably calculated to

deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party," where "any reliance on the allegedly false representations must be reasonable." Forbis v. Neal, 649 S.E.2d 382, 387 (2007). A plaintiff cannot establish reasonable reliance if he fails to make reasonable inquiry regarding the alleged statement. Caper Corp. v. Wells Fargo Bank, N.A., 578 F. App'x 276, 281 (4th Cir. 2014) (quoting Dallaire v. Bank of Am., N.A., 760 S.E.2d 263, 267 (N.C. 2014) (internal quotation marks omitted)). "Where a plaintiff 'could have discovered the truth [about the misrepresentation] upon inquiry, the complaint must allege that [the plaintiff] was denied the opportunity to investigate or . . . could not have learned the true facts by exercise of reasonable diligence' in order to survive a motion to dismiss." Id. (quoting Pinney v. State Farm Mut. Ins. Co., 552 S.E.2d 186, 192 (N.C. Ct. App. 2001) (emphasis supplied) (internal quotation marks omitted)). Furthermore, "[a]s a corollary of this broader principle, '[a] person who executes a written instrument is ordinarily charged with knowledge of its contents and may not base an action for fraud on ignorance of the legal effect of its provisions.'" Id. (quoting Int'l Harvester Credit Corp. v. Bowman, 316 S.E.2d 619, 621 (N.C. Ct. App. 1984)). However, the reasonableness of a party's reliance is "generally a question for the jury, except in instances in which 'the facts are so clear as to permit only one conclusion.'" Caper

25

<u>Corp.</u>, 578 F. App'x at 284 (quoting <u>Dallaire</u>, 760 S.E.2d at 267).

IBM argues that Vinson's fraud claim fails as a matter of law because IBM reserved the discretion in the IPL to review and reduce commission payments, which means that IBM did not make false representations with an intent to deceive Vinson. (Doc. 11 at 17.) IBM also argues that the IPL informed Vinson that "he should not rely on any statements made by anyone other than the 'highest level of management' about whether there might be any changes to his plan structure or how those changes might impact his commission payments." (<u>Id.</u>) IBM contends that because of these disclaimers in the IPL, it was not reasonable for Vinson to rely on any alleged misrepresentations about commissions being uncapped. (<u>Id.</u> at 18.) Additionally, IBM contends that Vinson's claim fails as a matter of law because the amended complaint does not allege that he was denied the opportunity to investigate or that he could not have learned the true facts of any alleged misrepresentation. (Doc. 14 at 10.)

Vinson does not allege that he was denied the opportunity to investigate or that he could not have learned the truth about the alleged misrepresentations by IBM. The IPL includes the clear disclaimer that

> [m]anagers below the highest levels of management do not know whether IBM will or will not change or adopt any particular compensation plan; they do not know whether IBM will or will not change or adopt any particular compensation plan; they do not have the ability to change

26

> the Plan terms for any employee; nor are they in a
> position to advise any employee on, or speculate about,
> future plans. Employees should make no assumptions
> about the impact potential Plan changes may have on their
> personal situations unless and until any such changes
> are formally announced by IBM.

(Doc. 9-1 at 3.) Vinson accepted the IPL and acknowledged that he read and understood its terms. (Doc. 9 ¶ 14; Doc. 9-1 at 2.) He does not allege that Messrs. Preston and Mitchell are at "the highest levels of management" — indeed, at the hearing, his counsel candidly conceded they are not. Consequently, neither supervisor could modify or advise Vinson as to the terms of his incentive payment Plan. (Doc. 9-1 at 3.) Vinson also does not allege that he "was denied the opportunity to investigate" or "could not have learned the true facts by exercise of reasonable diligence." Caper Corp., 576 F. App'x at 281. Had Vinson consulted his IPL, he would have realized that neither supervisor had the authority to bind IBM as to any statement regarding his commission plans, and thus any reliance by him was not reasonable as a matter of law. See Schwarzkopf, 2010 WL 1929625, at *14 (holding that even if the representations made by managers "were sufficient to support a claim for fraud, [plaintiff] cannot show justifiable reliance" because "managers referred [plaintiff] to the disclaimers in the Quota Letter" (which included a "Right to Modify or Cancel provision" identical to that in Vinson's IPL)).

However, as to the statements in the PowerPoint presentation

that payments and earnings opportunity are "uncapped," Vinson has plausibly alleged that the statements that his commissions would not be capped was false, material, made with intent to deceive, and one he could (and did) justifiably rely on to his detriment. At this preliminary stage, it is not clear from the facts alleged that Vinson could have discovered the truth about the alleged misrepresentation upon reasonable inquiry. While the IPL's "Right to Modify and Cancel" provision does grant IBM broad discretion to modify or cancel Vinson's incentive payment Plan, that discretion is reserved to IBM "during the Plan period up until any related payments have been earned under the Plan terms." (Doc. 9-1 at 3.) IBM has not identified any provision of the IPL that permits arbitrary capping of commissions at 400% of an employee's quota after they are "earned." Thus, whether IBM actually capped Vinson's commissions and misrepresented its policy on capping depends on facts not before the court.[10] Unlike the situation with the supervisors' alleged statements, IBM has not identified any basis upon which to establish as a matter of law that resort to the IPL would have demonstrated that Vinson's reliance was not reasonable. See Caper Corp., 578 F. App'x at 284 (noting that in the absence of a showing that "the facts are so clear as to permit

---

[10] Here, too, IBM's reference to its authority under the significant transactions provision depends on whether the facts demonstrate that it was actually invoked in Vinson's case.

only one conclusion," the reasonableness of reliance is a question of fact for the jury).

IBM's motion to dismiss Vinson's fraudulent misrepresentation claim will therefore be denied.

### F.   Negligent Misrepresentation

Vinson's sixth claim for relief alleges, in the alternative to his fraudulent misrepresentation claim, that IBM's statements, through its agents, that his commissions would not be capped constitute negligent misrepresentations.   (Doc. 9 ¶ 68–75.)   As with the previous claim, Vinson relies on the same factual bases. (Doc. 9 ¶¶ 70–75.)

To state a negligent misrepresentation claim, a plaintiff's complaint must plausibly allege: (1) that the plaintiff justifiably relied, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care.   River's Edge Pharms., LLC v. Gorbec Pharm. Servs., Inc., No. 1:10cv991, 2012 WL 1439133, at *20 (M.D.N.C. Apr. 25, 2012).   "The question of justifiable reliance [for negligent misrepresentation claims] is analogous to that of reasonable reliance in fraud actions."   Caper Corp., 578 F. App'x at 284 (quoting Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 513 S.E.2d 320, 327 (N.C. 1999) (internal quotation marks omitted)).

IBM repeats its same arguments here as it made for Vinson's

29

claim for fraudulent misrepresentation – namely, that he cannot show he justifiably relied on any alleged misrepresentation. (Doc. 11 at 19–20.) IBM argues that any reasonable inquiry would have led Vinson to read his IPL, whose disclaimers would have revealed IBM's discretion to review and reduce commission payments, and that the amended complaint fails to allege that Vinson was denied the opportunity to investigate or learn the true facts by the exercise of reasonable diligence. (Id.) Vincent offers the same responses as he did for the fraudulent misrepresentation claim. (Doc. 12 at 23.)

The analysis for determining whether Vinson has sufficiently alleged negligent misrepresentation is the same as that provided for the fraudulent misrepresentation claim. For the reasons set forth above, IBM's motion to dismiss will be granted to the extent Vinson relies on the statements of Messrs. Mitchell and Preston, but otherwise the motion is denied.

G.   **Punitive Damages**

Vinson's seventh cause of action alleges that IBM facilitated fraud and willful, wanton, and outrageous conduct, entitling him to punitive damages. (Doc. 9 ¶¶ 76–79.) IBM argues that Vinson's claim for punitive damages fails as a matter of law because it is derivative of his fraud claim, which IBM argues also fails. (Doc. 11 at 20.) Vinson responds by arguing that the claim for punitive damages should not be dismissed because the fraud claim should not

30

be dismissed.  (Doc. 12 at 24.)

Under North Carolina law, punitive damages are a type of relief, not an independent cause of action.  Gauldin v. Honda Power Equip. Mfg., 351 F. Supp. 2d 455, 458 (M.D.N.C. 2005); Bruton v. FirstHealth of the Carolinas, Inc., No. 1:12CV253, 2012 WL 5986788, at *2 (M.D.N.C., Nov. 28, 2012) ("The law does not recognize a freestanding cause of action for . . . 'punitive damages.'").  Because punitive damages cannot be pleaded as a free-standing cause of action, and because Vinson also requested punitive damages in his prayer for relief (Doc. 9 at 18), the seventh cause of action will be considered a form of relief pleaded.  Therefore, IBM's motion to dismiss Vinson's seventh cause of action is granted to the extent it purports to state a separate cause of action.  It will be denied to the extent Vinson seeks punitive damages for any other cause of action that would properly support such a remedy.

## III. CONCLUSION

For the reasons stated, therefore,

IT IS ORDERED that Defendant's motion to dismiss (Doc. 10) is GRANTED IN PART AND DENIED IN PART as follows:

1.  As to the first cause of action alleging breach of contract, the motion is GRANTED and the claim is DISMISSED;

2.  As to the seventh cause of action alleging punitive damages, the motion is GRANTED and the claim is DISMISSED, provided that Vinson's prayer for punitive damages remains;

3.   As to the remaining causes of action, the motion to dismiss is DENIED, except as to the portions of the fifth and sixth causes of action alleging fraudulent misrepresentation and negligent misrepresentation based on alleged statements of Messrs. Mitchell and Preston, as to which the motion to dismiss is GRANTED.


                                    /s/    Thomas D. Schroeder
                              United States District Judge

September 25, 2018